IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF PENNYSLVANIA

Amy Marie Siggelow                    :

       Plaintiff                      :    Case No. 3:15-CV-1308

       v.                             :

Carolyn W. Colvin                     :    (Judge Richard P. Conaboy)
Commissioner of Social Security
                                      :

       Defendant                      :

                                      :
_____

                            **Memorandum**

      We consider here Plaintiff's appeal from a decision of the

Social Security Administration ("SSA") that denied her application

for Disability Insurance Benefits ("DIB").  The issues have been

fully briefed by the parties (Docs. 16, 19 and 20) and this matter

is ripe for disposition.

I.    **Procedural Background.**

      On June 11, 2012, Plaintiff filed her application for DIB

alleging a period of disability beginning January 5, 2011.  (R.12).

The claim was denied at the initial level on September 25, 2012

whereupon Plaintiff filed a request for a hearing.  Plaintiff was

afforded a video hearing before an administrative law judge ("ALJ")

on November 7, 2013.  On December 26, 2013, the ALJ issued a

decision denying benefits.  That decision was subsequently affirmed

by the Appeals Council by Notice of Action dated May 10, 2015.  The

Appeals Council's action constitutes a Final Decision of the SSA.

                                 1

Plaintiff filed her complaint in timely fashion in this Court on July 1, 2015.  Plaintiff contends therein that the SSA's Findings of Fact and Conclusions of Law are unsupported by substantial evidence and contrary to law.  (Doc. 1, ¶ 8).  Plaintiff requests that this Court remand this case for further proceedings and award attorney's fees pursuant to the Equal Access to Act, 28 U.S.C. § 2412.

**II.  Factual Background.**

    **A.  Testimony Before the ALJ.**

Plaintiff Amy Marie Siggelow ("Plaintiff" or "Siggelow") testified as follows: at the time of the hearing she had only recently moved to Pennsylvania from Rochester, New York.  She resides with her husband.  She had not worked since January of 2011 (some 34 months prior to the hearing).  Plaintiff at that time was still receiving benefits from a disability insurance plan through her former employer.  The source of these benefits appears to have been the Rochester General Hospital.  (R.31-33).

Plaintiff testified further that her husband worked but did not have medical insurance.  At the time of her hearing she had to pay out-of-pocket for physician's services and pharmaceuticals.  Plaintiff was born on May 3, 1968 and attained her 44th birthday before the date of the hearing.  She is a high school graduate and holds a two-year Associate's Degree in Health Information Technology.  She had work experiences in several different

hospitals.  Her work involved reviewing patients' medical records and entering information from these into a computer program that would allow the hospitals to determine what an insurance company would pay for various medical services.  These jobs were desk jobs using a computer.  (R.34-35).

Plaintiff testified that her primary physical complaints are the symptoms of her fibromyalgia.[1] She stated that she is experiencing pain, by her estimation from "a 3 to a 9 pretty much 24/7".  She describes the pain as "very deep" and "severe".  She experiences shooting pains through her legs and "muscle knots" in her neck, back and calves.  Remaining too long in one position exacerbates her "muscles knots".  To relieve these symptoms she gets up and stretches or takes her dog for a very short walk.  She also finds that hot baths and application of microwaveable hotpads affords her some relief by relaxing her muscles.  (R.36-37).

Plaintiff takes numerous pain medications including: Hydrocodone, Tramodol, Benzaprine, and Meloxicam.  She believes that this combination of medications "takes the edge off, and I can function minimally; but I don't want to take any more than that." By way of functioning minimally, Plaintiff testified that she can

---

[1] Fibromyalgia syndrome is a common and chronic disorder characterized by widespread pain, diffused tenderness, and a number of other symptoms.  Although fibromyalgia is often considered an arthritis-related condition, it is not truly a form of arthritis because it does not cause inflammation or damage to the joints, muscles or other tissue.  Like arthritis, however, fibromyalgia can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities.  See NIH.gov/disorders/fibromyalgia.

put dishes in the dishwasher, do laundry if someone brings it to the washer/dryer area for her, and take her dog for short walks ("about 4 houses").  These walks typically take her about 15 minutes.  She only goes grocery shopping when her husband is available.  She can usually take the items she purchases from the shelves but when they are consolidated into bags she needs her husband to carry them.  She can drive a car and does so two or three times a week.  Her driving is confined to trips to the grocery store or bank.  She stated that she assists in managing the household finances and that she and her husband each do their parts.  (R.38-40).

Plaintiff also testified about the effects of her diabetic neuropathy, for which she takes Metformin.  She thinks that the Metformin is helping to control her diabetes but is unsure whether the various symptoms she experiences - - the shooting pain in the legs and the "muscle knots" in her neck, back and legs - - are related to diabetic neuropathy or strictly attributable to her fibromyalgia.  Plaintiff also briefly discussed that she had been diagnosed with carpal tunnel syndrome but that it has subsided somewhat since she stopped working. She has not undergone a carpal tunnel release.  (R.40-42).

Plaintiff stated that she has also been treated for depression for which she takes Trazodone and Buspirone.  She believes these medications have helped alleviate her depression.  She reiterated

4

that fibromyalgia is her primary problem.  (R.42).

On questioning by her attorney, Plaintiff testified to joint pain caused by arthritis.  This pain is particularly problematic during inclement weather.  Her neck, back and leg pain are her primary concern and they are present to some degree "98% of the time".  She must change positions every 10 to 15 minutes to alleviate these pains.  She spends much of her time in a recliner because she can easily alter her position in that type of chair. Plaintiff also described what she termed "brain fog" - - a mental state where she gropes for words and has trouble remembering things.  She speculates that this "brain fog" may result from side effects of her medications or perhaps be related to her fibromyalgia.  (R.43-46).

Also testifying was Diane Howell, a rehabilitation counselor and vocational expert.  Ms. Howell stated that Plaintiff's work history as a "medical coding technician" was classified as "sedentary work, skilled."  Ms. Howell was asked a hypothetical question by the ALJ wherein she was to assume a person of Plaintiff's age, education and work background who could perform a full range of sedentary activities but for the following limitations: the need to change positions for one to two minutes every 30 to 45 minutes; the inability to climb on ropes, ladders or scaffolds; the inability to use the upper extremities to constantly reach, handle or finger objects; the inability to work around

5

unprotected heights or exposed machinery; the inability to
withstand extreme heat, cold or humidity; and, because of pain
distraction, the inability to be tasked with anything but routine,
uninvolved work activities that do not require "a fast assembly
quota pace".  On the basis of this hypothetical question, Ms.
Howell opined that Plaintiff was incapable of performing any of her
previous occupations.  Ms. Howell also testified that the person
described in the ALJ's hypothetical question could still perform
various jobs - - such as a new account clerk, a final assembler,
and a polisher/inspector for optical equipment - - that exist in
significant numbers in the national economy.  When the ALJ asked
whether Plaintiff would remain employable if she had all the
restrictions of the first hypothetical question with an added
restriction that she would be "off task" for up to 10 per cent of
the workday, Ms. Howell responded that this additional restriction
would render Plaintiff unemployable.  (R.47-51).

   **B.   Medical Evidence.**

   **1.   Dr. Matthew Fleig**

   Dr. Fleig was Plaintiff's treating physician for more than
three years.  His treatment records indicate that he saw Plaintiff
on no fewer than 7 dates between August 11, 2011 and October 15,
2013.  (R.478-490).  Dr. Fleig diagnosed Plaintiff with
fibromyalgia as early as August 11, 2011.  This diagnosis remained
constant throughout Dr. Fleig's relationship with Plaintiff.  He

noted on multiple occasions that Plaintiff's fibromyalgia was chronic and, while the symptoms waxed and waned over time, they were present on a day to day basis for years.  Dr. Fleig treated Plaintiff's fibromyalgia symptoms with various medications including Hydrocodone, Meloxicam, Tramodol and Pregabalin (Lyrica) which at some point Plaintiff, who lacked prescription insurance, could no longer afford.  Dr. Fleig also treated Plaintiff for insomnia over a period of years and prescribed Ambien to help Plaintiff sleep.

Dr. Fleig's office notes consistently describe Plaintiff's symptoms as interfering with her activities of daily living and consistently observe that she receives mild relief from various pain medications.  Dr. Fleig also consistently alluded to the fact that on some days Plaintiff was able to do minimal chores but on other days her pain was so significant that she could not perform any tasks.  On multiple office notes Dr. Fleig wrote that Plaintiff's fibromyalgia was under "sub-optimal control" and that Plaintiff "continues to be disabled due to the extent of interference of symptoms with day-to-day ADL's".  (R.at 478, 479, 480, 482, 487-88, and 489).

On July 17, 2012, Dr. Fleig completed a "Fibromyalgia Residual Functional Capacity Questionnaire" with respect to Plaintiff. Dr. Fleig's report indicated: (1) that he had been treating Plaintiff for three years; (2) that her fibromyalgia was a "lifetime

7

condition"; (3) that her impairments have lasted or can be expected to last at least 12 months; (4) that Plaintiff exhibits muscle tenderness to palpation and has decreased range of motion due to muscle spasm; (5) that her fibromyalgia symptoms include multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, irritable bowel syndrome, numbness and tingling, anxiety, depression, and carpal tunnel syndrome. Dr. Fleig stated that Plaintiff was not a malingerer and that emotional factors contribute to the severity of her symptoms and functional limitations. Dr. Fleig found that Plaintiff had pain in all sectors of her spine, chest and shoulders as well as bi-lateral pain in her extremities, hips, knees and ankles. He described her pain level as "deep muscle, chronic 6/10 pain". Dr. Fleig also stated that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in his evaluation. He found that Plaintiff's pain and other symptoms were severe enough to interfere with the attention and concentration needed to perform even simple work tasks "frequently", that is 34% to 66% of an 8-hour working day. Dr. Fleig also indicated that Plaintiff could neither sit nor stand for more than 15 minutes before needing to change position and walk around and that she could stand/walk for less than two hours and sit for about four hours in an 8-hour working day. Dr. Fleig added that Plaintiff needs a job where she would be permitted to change positions and

postures at will and that she would need daily unscheduled breaks
of 30 minutes duration in which she would be allowed to lie down or
sit quietly.

In terms of her physical capacities, Dr. Fleig opined that
Plaintiff could rarely lift up to 10 pounds, never lift more than
10 pounds, that she could rarely twist, stoop, or crouch and never
climb ladders, that she could rarely look down or up in a sustained
way or turn her head right or left, and that she had significantly
limitations with respect to reaching, handling or fingering.
Finally, Dr. Fleig's opinion was that Plaintiff would have "good
days" and "bad days" and that she would miss on average more than
four work days per month as a result of the impairments caused by
her fibromyalgia.  (R.251-254).

**2.   Dr. Harbinder Toor.**

On September 11, 2012, Plaintiff was referred by the Division
of Disability Determination for an internal medical examination.
On the basis of one session with Plaintiff, Dr. Toor diagnosed a
history of: (1) fibromyalgia with multiple trigger points; (2)
diabetes; (3) depression; (4) hypertension; (5) high cholestoral;
and (6) gastro-esophageal reflux disease.  Dr. Toor found that
Plaintiff was moderately limited in terms of standing, walking,
sitting, pushing, pulling, reaching or twisting of the cervical
spine.  He found Plaintiff to have moderate to severe limitations
in bending and lifting and that "pain due to fibromyalgia in

multiple sites can interfere with her physical routine". (R.469-472).

### 3. Dr. Ashanphi Gajaweera

On June 30, 2011, Dr. Fleig referred Plaintiff to Dr. Gajaweera for "a neurologic follow-up for evaluation of a chief complaint of paresthesias."[2] Dr. Gajaweera conducted nerve conduction studies and concluded that Plaintiff had diffuse paresthesias as well as mild length-dependent peripheral neuropathy.[3] Dr. Gahaweera found that Plaintiff suffered from moderately severe carpal tunnel syndrome and that her neuropathy was secondary to her diabetes. (R.256-57).

### 4. Christine Ransom, Ph.D.

On September 11, 2012, Plaintiff was subjected to an Adult Psychiatric Evaluation by Dr. Ransom. Dr. Ransom found Plaintiff to be "cooperative and socially appropriate" with "slow and halting speech". Dr. Ransom found Plaintiff's thought processes to be "coherent and goal-directed with no evidence of hallucinations, delusions or paranoia". Plaintiff's attention and concentration were "mildly impaired" as was her immediate memory and her recent memory. Dr. Ransom concluded that Plaintiff "can follow and

---

[2] Paresthesias refers to a burning or prickling sensation that is usually felt in the hands, arms, legs or feet, but can also occur in other parts of the body. See NIH.gov/disorders/paresthesias.

[3] Peripheral neuropathy is nerve disease or damage of various types including parethesias that can lead to an exaggeratedly intense experience of touch. See NIH.gov/disorder/neuropathy.

understand simple directions and instructions, perform simple tasks
independently, maintain attention and concentration for certain
tasks, maintain a simple regular schedule and learn simple new
tasks.  She would have moderate difficulty performing complex
tasks, relating adequately with others and appropriately dealing
with stress due to major depressive disorder, currently moderate.
The results of the evaluation are consistent with the claimant's
allegations."  Dr. Ransom opined that Plaintiff should seek
psychiatric treatment, that she would likely improve with more
intensive treatment.

**C. ALJ's Decision.**

The ALJ's decision (Doc. 11-2) was unfavorable to the
Plaintiff.  It included the following findings of fact and
conclusions of law:

(1)  The claimant meets the insured status requirements
     of the Social Security Act through December 31,
     2016.

(2)  The claimant has not engaged in substantial gainful
     activity since January 5, 2011, the alleged onset
     date.

(3)  The claimant has the following severe impairments:
     fibromyalgia; non-insulin dependent diabetes; mild
     diabetic neuropathy; bi-lateral carpal tunnel
     syndrome; and depression.

11

(4)   The claimant does not have an impairment or
combination of impairments that meets or medically
equals the severity of one of the listed impairments
in 20 CFR Part 404, Subpart P, Appendix 1, 20 CFR
404.1520(d), 404.1525 and 404.1526.

(5)   After careful consideration of the entire record, I
find that the claimant has the residual functional
capacity to perform a full range of sedentary work
as defined in 20 CFR 404.1567(a), except the
claimant needs an opportunity as often as every 30
to 45 minutes to briefly (1-2 minutes) change
positions, plus have access to normal work breaks.
The claimant must avoid climbing ladders, ropes, and
scaffolds, and avoid more than occasional climbing
ramps and stairs, balancing, stooping, kneeling,
crouching, and crawling.  The claimant must also
avoid constant overhead upper extremity reaching,
avoid constant handling, fingering, and feeling
tasks, avoid dangerous work hazards (including
unprotected heights and exposed machinery); and
avoid extreme heat, humidity, and cold.  Moreover,
because of pain and mental health distractions
preventing detailed decision making, the claimant is
limited to routine, uninvolved tasks not requiring a

fast assembly quota pace.

(6)   The claimant is unable to perform any of her past
      relevant work.

(7)   The claimant was born on May 3, 1969 and was 41
      years old, which is defined as a younger individual
      age 18-44 on her alleged disability onset date.

(8)   The claimant has at least a high school education
      and is able to communicate in English.

(9)   Transferability of job skills is not material to the
      determination of disability because using the
      Medical Vocational Rules as a framework supports a
      finding that the claimant is "not disabled" whether
      or not the claimant has transferable job skills.

(10)  Considering the claimant's age, education, work
      experience, and residual functional capacity, there
      are jobs that exist in significant numbers in the
      national economy that the claimant can perform.

## III. Disability Determination Process.

The Commissioner is required to use a five-step analysis
to determine whether a claimant is disabled.[4]  It is necessary for

---

[4]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such

the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that

---

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

exist in the national economy that Plaintiff is able to perform. (R.21).

## IV. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence--

> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See Cotter*, 642 F.2d at 706
> ("Substantial evidence" can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear that it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent

that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the

facts presented." Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. See, e.g., Albury v. Commissioner of Social Security, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing Burnett v. Commissioner, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001).

**V.   Discussion.**

**A. General Considerations**

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. See Dobrowolsky, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. Id. "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter

18

II, of the Social Security Act." Hess v. Secretary of Health, Education and Welfare, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. Dobrowolsky, 606 F.2d at 406. Further, the court in Dobrowolsky noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." Id.

**Plaintiff's Allegation of Error.**

**A. Whether the ALJ Erred in Rejecting the Medical Opinion of the Treating Physician Without Contrary Supporting Evidence?**

Dr. Fleig diagnosed Plaintiff with fibromyalgia. This diagnosis was made from the perspective of a treating physician with a long longitudinal history of observing his patient. Dr. Fleig noted on multiple occasions that Plaintiff was disabled or continued to be disabled over a period well in excess of one continuous year, the period of disability necessary to support an award of DIB. Dr. Fleig elaborated on Plaintiff's status in a "Fibromyalgia Residual Functional Capacity Questionnaire" wherein he concluded that Plaintiff's numerous physical symptoms (including multiple tender points, non-restorative sleep, chronic fatigue syndrome, numbness and tingling, depression and anxiety) produced

physical and cognitive impairments far in excess of those assumed in the ALJ's hypothetical question to the vocational expert and subsequent assessment of Plaintiff's residual functional capacity. Additionally, Dr. Fleig indicated that Plaintiff would need to be accommodated to the extent that she could change positions at will and would, on a daily basis, need to take an unscheduled break of up to 30 minutes in a supine position or sitting quietly.  Finally, Dr. Fleig noted that Plaintiff would likely miss four work days each months due to symptoms of her fibromyalgia.  This Court is well aware from adjudicating literally hundreds of these cases over the years that no employer is going to tolerate absences of that frequency.

Balanced against the medical evidence provided by the treating physician, we have literally nothing.  No other physician has provided comment regarding the extent of Plaintiff's limitations from fibromyalgia. Dr. Toor, the consultative examining physician, did concur that Plaintiff suffered from fibromyalgia with multiple trigger points and found that she had moderate limitations with respect to standing, walking, sitting, pushing, pulling, reaching and twisting, along with moderate to severe limitations bending and lifting.  Dr. Toor did not, however, attempt to express what specific work activities Plaintiff could perform or how long and how often she could perform them.  Moreover, Dr. Toor noted that "pain due to fibromyalgia in multiple sites can interfere with her

physical routine." Dr. Toor made no attempt to specifically describe the degree or frequency of interference that Plaintiff's fibromyalgia based pain would cause. Thus, while corroborating Dr. Fleig's diagnosis of fibromyalgia and the existence of various limitations resulting from that diagnosis, Dr. Toor's consult provides no reasonable basis for concluding that Dr. Fleig has overstated the effects of Plaintiff's fibromyalgia.

The ALJ's failure to cite a medical opinion that would permit her to disregard the opinion of the treating physician here is reason enough to remand this matter. An ALJ is categorically precluded from making an RFC determination absent a medical opinion that supports it. Doak v. Heckler, 790 F.2d 26, 29 (3d. Cir. 1986). To do so is to make an RFC determination that is unsupported by substantial evidence and, thus, void. Diller v. Acting Commissioner of Social Security, 962 F.Supp. 2d. 761, 769 (WD. Pa. 2013). Because the only medical assessment of Plaintiff's RFC that exists in this record is that of Dr. Fleig, the ALJ's determination to accord superior weight to a state agency psychological consultant (R.20) is simply impermissible.[5]

**B.    Whether the ALJ Improperly Discredited Plaintiff's Allegations of Pain?**

---

[5] The opinion of an agency single decision maker (S.D.M) does not constitute medical opinion evidence at the appeal levels. Yorkus v. Astrue, 2011 WL 7400189 (E.D. Pa. 2011). Beyond that, relying on a psychological consultant's assessment of a person's limitations due to fibromyalgia is akin to seeking advice from a carpenter about an electrical problem.

Ordinarily, an ALJ's credibility determination is entitled to deference by a district court because "he or she has the opportunity at a hearing to assess a witness's demeanor."   Reefer v. Barnhart, 326 F.3d 376-380 (3d. Cir. 2003).   However, where, as here, "medical evidence does support a claimant's complaints of pain, the complaints should be given 'great weight' and may not be disregarded unless there exists contrary medical evidence."   Mason v. Shalala, supra at 1067-68.   Indeed, the ALJ found as a fact that "the claimant's medically determinable  impairments could reasonably be expected to cause the alleged symptoms...".   (R.17). In choosing to conclude that the claimant's pain was not as intense, persistent and limiting as Plaintiff claims, the ALJ was, in effect, substituting his judgment for that of a medical doctor. This is a prohibited practice.   Dumond v. Commissioner of Social Security, 875 F.Supp. 2d. 500, 510 (W.D.Pa. 2012) (citing Schmidt v. Sullivan, 914 F.2d 117-118 (7th Cir. 1990).   In this case, the Plaintiff's consistent complaints of unrelenting severe pain corroborated by her physician's unrefuted diagnosis of fibromyalgia required that the Commissioner assign great weight to the veracity of these complaints.[6]

---

[6] We note that the ALJ seemed to discredit Plaintiff's fibromyalgia-related complaints due to the fact that there was no "clinical proof of a significant worsening of the claimant's physical and mental health conditions" after her alleged onset date.  This should have been no surprise in as much as fibromyalgia is a condition that is diagnosed primarily on subjective complaints and "cannot be proven objectively."  See Sinker v. Acting Commissioner of Social Security, Docket No. 13-CV-2313, Docket Item 16 at Page 11, (M.D. Pa. 2014) (citing Steele v. Boeing, Inc. 225 F.App'x 71-75

**VI.   Conclusion.**

The Court determines that the Commissioner's denial of benefits in this case is unsupported by the requisite substantial evidence.   See Dobrowolsky and Cotter, supra.   Accordingly, this matter will be remanded to the Commissioner for further proceedings to address the errors referenced in this Memorandum.   An Order consistent with this determination will be filed contemporaneously.


BY THE COURT



S/Richard P. Conaboy
Honorable Richard P. Conaboy
United States District

Dated: March 3, 2016

---

(3d. Cir. 2007).  In effect, the ALJ was looking for something that does not exist and the lack of "clinical proof" of fibromyalgia cannot refute its existence.